HANNAH RITCHIE *et al.* v. THE KANSAS, NEBRASKA & DAKOTA RAILWAY COMPANY *et al.*

1. ISSUE OF LAW—*Motion for New Trial.* In order to review the decision of a district court in determining an issue of law a motion for a new trial is not necessary. Section 306 of the code of civil procedure defines a new trial as a re-examination of an issue of fact.

2. REVIEW —*Issue of Law—New Trial.* An issue of law may arise either on the pleadings, an agreed statement of facts, the report of a referee, special verdict of a jury or findings of fact by the court; and where no issue of fact is raised, or where all issues of fact have been tried and determined, issues of law alone remain,

and the decision of the trial court thereon can be reviewed here without a motion for a new trial having been filed below.

3. Two WRITTEN INSTRUMENTS, *Treated as One*. A deed of general warranty in the usual form conveying lands for the expressed consideration of the sum of $1 and other good and valuable considerations, and a written contract executed at the same time by which the grantee in consideration of the deed agrees to do certain acts, and provides that in case of failure to perform such contract the deed shall become void and the lands conveyed revert to the grantor, both instruments, being acknowledged and recorded at the same time, are to be treated as one and construed together.

4. DEED—*Breach of Conditions Subsequent—Title*. R. and wife conveyed certain lands adjoining the city of Topeka to the K. N. & D. Rly. Co., and in consideration thereof, the railway company covenanted by a separate instrument, duly executed and acknowledged, to construct its line of railway through the lands granted, and erect and forever maintain on said tract a passenger-depot and a freight-depot of a size and character suitable and sufficient for the transaction of its business and the accommodation of the public at said point, and to cause all passenger- and freight-trains to stop at such depots, respectively, so as to transact and perform all business that may be there offered; and it was provided therein that "if said company shall fail to construct its line of railroad through said tract of land and erect thereon said passenger- and freight-depots within one year from this date, or shall fail to keep and maintain said depots and use the same as herein provided, then the conveyance of said real estate to said company shall be void, and said real estate shall revert to said R. and his heirs." Both instruments were filed for record at the same time, and afterward recorded. The railway company constructed its railroad and buildings suitable for freight- and passenger-depots, and stopped all its trains thereat, but failed to use the building designed for a passenger-depot as such. Up to the time of the commencement of this action, a period of more than a year and 10 months after the date of the contract, it used another building about a mile away as its Topeka passenger-depot. *Held*, That these instruments together constitute a conveyance on conditions subsequent; that the facts found by the trial court show a substantial breach of the conditions, and that the title reverts to the plaintiffs, who are heirs of the grantor.

5. EJECTMENT *on Breach—Formal Entry*. Under the facts stated, the plaintiffs, alleging in their petition that they are the legal and equitable owners of the real property, entitled to the immediate possession thereof, and that the defendants unlaw-

fully keep the plaintiffs out of possession, may maintain an action in the nature of ejectment without first making a formal entry on the lands.

6. DEDICATION—*None to Railroad Uses—No Estoppel.*  The filing of plats by the grantor and his heirs after breach of the conditions of the conveyance, but before claiming a forfeiture on account thereof, showing the location of the defendant's railway, side-tracks, and buildings, and designating a part of the lands conveyed as "K. N. & D. depot grounds," but which do not indicate the boundaries of the lands occupied by the railroad company, nor contain any words expressive of an intent to make any dedication to railroad uses, and where the railroad grounds are not surrounded nor included within the platted portion, does not amount to a dedication of such lands to railroad uses, nor constitute a waiver or estoppel barring the plaintiffs' recovery for any breach of conditions occurring subsequent to the filing of such plats.

7. CONDITIONS SUBSEQUENT, *Strictly Construed.*  Conditions subsequent, working a forfeiture of an estate, are to be strictly construed.

8. RIGHTS OF RAILROAD COMPANY—*Measure of Recovery.*  After the execution of the deed and contract, the railway company took possession of the land conveyed, constructed a line of railroad across it, built side-tracks, depot buildings, roundhouse, stockyards, water-tank, and other structures and conveniences for its accommodation thereon.  *Held,* That if the defendants elect to retain the land and improvements, they should be permitted to do so on payment of the value of the land, exclusive of improvements placed thereon by the defendants, measured as of the date of the commencement of this action, with interest from that date.

——— *New Trial.*  As the findings of fact in this case fail to show either the value of the improvements made by the defendants or the value of the land, this court cannot direct what judgment should be entered by the trial court, and must order a new trial.

*Error from Shawnee District Court.*

THIS action was brought by *Hannah Ritchie,* Hale Ritchie, and John Ritchie, as heirs at law of John Ritchie, deceased, against *The Kansas, Nebraska & Dakota Railway Company* and the Missouri Pacific Railway Company to recover a part of section 6, township 12, range 16, in Shawnee county.  The answer was a

general denial. A jury was waived, and the case was tried by the court. At the request of the parties, the conclusions of fact and of law were separately stated, and are very voluminous. It appears that a deed, dated April 7, 1886, and acknowledged on the 15th day of the same month, was executed by John Ritchie, and Hannah Ritchie, his wife, conveying the lands in controversy to the first-named railway company. The instrument is in form an ordinary warranty deed, and recites as the consideration thereof the payment of the sum of $1 and other good and valuable considerations. At the same time, as a part of the same transaction, a contract in writing was duly executed and acknowledged by the railway company. The deed and contract were filed for record simultaneously. The following is a copy of the railway company's agreement:

" This agreement, made this 7th day of April, 1886, between the Kansas, Nebraska & Dakota Railway Company, a corporation organized under the laws of the state of Kansas, of the first part, and John Ritchie, of the second part, witnesseth : That in consideration of the sale and conveyance by said John Ritchie and wife to the party of the first part of a certain tract of land in the northeast quarter section 6 in township 12 of range 16, in Shawnee county, Kansas, and the right-of-way through part of said quarter-section, the receipt of which conveyance is hereby acknowledged, the said party of the first part for itself, its successors and assigns, hereby agrees that it will construct its line of railroad through said tract of land so granted, and that it will erect and forever maintain upon said tract of land a passenger-depot and a freight-depot of a size and character suitable and sufficient for the transaction of its business and the accommodation of the public at said point, and shall cause all passenger- and freight-trains to stop at such depots respectively so as to transact business, and perform all business

that may be there offered.   And said party of the first
part further agrees that it will not sell, let, lease or
give away said tract of land or any part thereof to any
person or persons or corporation for the purpose of
transacting thereon any business whatsoever, but shall
use the same for its railroad business exclusively ; and
if said company shall fail to construct its line of rail-
road through said tract of land and erect thereon said
passenger- and freight-depots within one year from
this date, or shall fail to keep and maintain said
depots and use the same as herein provided, then the
conveyance of said real estate to said company shall
be void, and said real estate shall revert to said John
Ritchie and his heirs ; and as a further consideration
for the conveyance of said real estate to said company,
it is hereby promised and agreed that said John
Ritchie and his wife shall have the right to ride free
of charge upon all regular passenger-trains of said
company during their respective lives.    In witness
whereof the party of the first part has caused these
presents to be executed by its president, and attested
by its secretary, with the seal of the corporation an-
nexed, on the day and year first above written.''

   The railroad company took possession of the land
under this deed and constructed its railway across it.
It also constructed buildings for freight- and passenger-
depots, side-tracks and roundhouse, stock-yards and
other structures for the accommodation of its business.
The railroad and depot buildings were so constructed
within one year from the date of the deed and con-
tract.    The building designed for a passenger-depot is
situated west from the main track, and is surrounded
by a platform, the east edge of which is 42 feet from
the west rail of the main-track.    A platform 95 feet
in length and eight feet wide extends along the west
side of the track, and is connected with the depot
platform by a walk 16 feet wide.    The building de-
signed for a freight-depot is located 32 feet west from

the passenger-depot. On the 10th of May, 1887, John Ritchie and wife caused a plat of a part of the quarter-section of land in which the tract in controversy was located, belonging to them, to be filed in the office of the register of deeds of Shawnee county, as Ritchie's addition to the city of Topeka. John Ritchie died August 31, 1887. On December 22, 1887, Hale Ritchie and John Ritchie and their wives executed and acknowledged another plat of the same lands for the purpose of making some changes in the former plat. This plat was approved by the mayor and council of the city of Topeka, within which said territory had become included, and was filed for record on January 5, 1888. Both of these plats showed the location of the defendant's railway and side-tracks, and on part of the tract of land conveyed was marked "K. N. & D. depot grounds." The plat also showed the location of the passenger- and freight-depots, the spur-track, roundhouse, and turntable. The Kansas, Nebraska & Dakota Railway Company occupied said lands for railroad purposes, and continued to operate its line of railroad from Fort Scott to Topeka until February 23, 1887, when the Missouri Pacific Railway Company took possession and control of its entire line, together with the property in controversy, and all other real and personal property before that time owned and used by the Kansas, Nebraska & Dakota Railway Company. Annual passes, issued in the usual form, were given to John Ritchie during his lifetime, and have been also given to Hannah Ritchie. John Ritchie used his pass once on a trip to Fort Scott. Hannah Ritchie never used her pass at all, and returned the passes for 1887, 1888, and 1889. The depot buildings are of

a size and character suitable and sufficient for the business of the railroad at that point.

At the time of the construction of the railroad the company purchased a brick building at the corner of Fifth avenue and Adams street in Topeka, about one mile from the land in controversy to which its line of road was constructed, and this building has been used as a passenger-depot ever since. As to the maintenance and use of the depots, the court made the following findings:

"From the time of the completion of said line of railroad up to the commencement of this action, and to the time of the trial, the defendants have caused all passenger- and freight-trains to stop at said depots respectively, so as to transact business and perform all business there offered, the station being designated as 'South Topeka.' But neither of said defendant railway companies, prior to December 1, 1889, sold any passenger tickets with the words 'South Topeka' printed thereon to passengers to ride on or over said road, at any station or other place south of said South Topeka, but has since said railway went into operation sold such passenger tickets with the name of the station, where from and where to printed thereon to and from every other station on said road, except flag- or signal-stations. Nor did either of said railway companies, prior to December 1, 1889, ever sell any passenger tickets marked or stamped as from said South Topeka station to any place on said railway. Said companies have also kept on sale at the several regular ticket-offices tickets with the name of the stations where sold printed thereon, but with the station of the destination left blank, the said blank being filled by the ticket-agent with pen and ink at the time of the sale. Passengers going from South Topeka to any other station on said line of railroad where tickets were sold might have obtained these tickets if they desired to do so. During all the time prior to the commencement of this action a telegraph office was kept in said

freight-depot, and another one at the Fifth street pas-
senger-depot, and whenever a passenger applied to
the agent, operator or clerk at South Topeka for a
ticket, the telegraph operator would wire the agent
or person in charge of the Fifth street depot to bring
or send by the conductor on the train a ticket for such
passenger, and the business would be so done, except
in case the order was sent too late, as the agent or
person in charge of the Fifth street passenger-depot
generally went to South Topeka on the train.   In all
instances, when such a thing occurred, such ticket on
its face showed or read from Topeka and not from
South Topeka, and the rate of fare was paid therefor
from Topeka and not from South Topeka.   The passen-
ger business at South Topeka was very light, and nearly
all the passengers got on without tickets and were
charged ticket fare only.   Some passengers, not know-
ing this fact however, would go to the Fifth street de-
pot or by some other railroad.   All baggage offered at
South Topeka was received there, but no checks were
given except on the train.   All baggage destined for
South Topeka was put off there, and delivered to the
owner on surrender of the check.   From the time of
the completion of said passenger-depot up to the com-
mencement of this action it was not kept open for the
accommodation of passengers, and although there was
a stove in the middle or office-room, no fire was kept
in it except occasionally, and during part of the time
the stovepipe was down.   Temporary plank seats
were left in the waiting-room on completion of the
building, but they were removed at some time which
does not distinctly appear.   Passengers awaiting trains
stood or sat upon the depot platforms, the projecting
roof at the sides and ends affording some shelter from
sun and rain, but sometimes they would go into the
office-room of the freight-depot where a fire was kept
when the weather required it, and the freight-depot
room was always unlocked, except when employees
were absent at meals or temporarily on business, and
no passengers were excluded from said room, although
there was no sign or notice posted to show that it was

intended for the accommodation of passengers, and the only seating arrangements were two or three chairs. No passenger or freight traffic was ever refused at South Topeka."

This action was commenced on the 13th day of February, 1888. About the middle of May, 1888, the telegraph office was removed into the South Topeka passenger-depot, which has been kept open ever since that time, but no tickets were kept on sale until about 10 days before the commencement of the trial of this action, on the 25th day of November, 1889. The taxes on this property for the years 1887, 1888 and 1889 were paid by the Missouri Pacific Railway Company. The court also made the following findings:

"21. That said John Ritchie, the grantor in said deed, was never known to express any dissatisfaction with the manner of the occupation of said conveyed tract by the defendants; but on or about May 9, 1887, he appeared before the city council of Topeka with the map or plat referred to in conclusion of fact No. 3, and some objection being made that the streets were not laid out or projected across the railroad track, he stated that he had conveyed that tract to the railroad company, and that any arrangement for opening the street across it would have to be made with the railroad company; and neither he nor the plaintiffs, nor any of them, ever made an entry upon said tract, and the plaintiffs never made any demand upon the defendants for the possession thereof, except by the commencement of this action, and they never gave notice to the defendants that they would claim a forfeiture of the estate, and they never did any act with the knowledge of the defendants indicating a purpose to obtain the title or the possession of the tract in controversy, except by the commencement of this action; but one of the plaintiffs on one or two occasions, when walking over the foregoing-granted premises before the commencement of this action,

stated to a friend that he claimed the land for the heirs of John Ritchie, but the defendants or their agents or servants had no knowledge or information of such claim until after this action was commenced."

" 32. That the Missouri Pacific Railway Company, by and through its agents thereunto lawfully authorized, in the spring of 1887, applied to the Ritchies to get them to consent to release the agreement of April 7, 1886, mentioned in conclusion of fact No. 2 ; whereupon said Ritchie expressly refused so to do in any respect; but on the contrary thereof then and there advised and notified the said Missouri Pacific Railway Company that they would in all things insist upon the faithful performance of said contract or agreement, and if said company declined to live up to said contract it must convey or deed back the land to them."

The court also made very full findings with reference to the surroundings of this land.   At the time of, the execution of the deed and contract it was included within the city of South Topeka, which was consolidated with and became a part of the city of Topeka in 1887.   The findings show its location with reference to the dwellings of the inhabitants of Topeka and the more important public buildings.   As conclusions of law the court found, first, that the plaintiffs are not entitled to recover in this action ; second, that the defendants are entitled to a judgment against the plaintiffs for costs in this action.   Both the plaintiffs and the defendants reserved exceptions to the findings of fact, and the plaintiffs excepted to the conclusions of law.   Judgment for defendants.   The plaintiffs come to this court.

*E. E. Chesney*, and *Valentine, Godard & Valentine*, for plaintiffs in error, made many points and cited

authorities in support thereof, among which are the following :

· The later and better-considered authorities of the present day seem to hold that the commencement of an action of ejectment is all that is necessary to cause the title to the property held under a condition subsequent to revert, and to hold that the action of ejectment may under such circumstances be maintained. See *Ruch v. Rock Island*, 97 U. S. 693, last part of the opinion ; *Cowell v. Colorado Springs Co.*, 3 Colo. 82 ; same case, 100 U. S. 55, 58 ; *Plumb v. Tubbs*, 41 N. Y. 442, 450 ; *G. C. & S. F. Rly. Co. v. Dunman*, 74 Tex. 265, 267 ; *Cornelius v. Ivins*, 26 N. J. L. ( 2 Dutch.) 376, 386, 387 ; *Austin v. Cambridgeport Parish*, 21 Pick. 215, 224 ; Tied. Real Prop., § 277.

*Waggener, Martin & Orr*, for defendants in error, submitted, among many points made and authorities cited, the following :

If the estate was upon condition, and the condition was not waived, and has not been performed, yet the land having been conveyed with warranty and no declaration of forfeiture nor entry upon the premises having been made by the plaintiffs nor their ancestor, and there being no judgment relieving against the warranty, ejectment will not lie.

At common law, before bringing an action for recovery of land granted upon condition subsequent, it was necessary for the plaintiff to make an actual entry upon the premises in order to avoid the conditional estate. 2 Bl. Com. 155 ; *Austin v. Cambridgeport Parish*, 21 Pick. 215, 224 ; *Steavens v. Neavis*, 8 Allen, 595, 598.

Kent says (4 Com. 122) :

"The grantor had no devisable interest by means

of the condition until he had restored his estate by entry or by action.''

There may be three remedies on a non-performance of a condition : the grantor may re-enter, or bring an action for damages, or file a bill in equity for specific performance of the conditions of the covenants. *Stuyvesant v. Mayor, etc., of New York,* 11 Paige, 415. See, also, 2 Greenleaf's Cruise on Real Property, title 13, ch. 2, §§ 36–39, ¶ ¶ 39, 40.

In this case it is found by the court (conclusion of fact 21) that neither the plaintiffs nor their ancestor ever made any entry or claim before the commencement of this action.

The opinion of the court was delivered by

ALLEN, J. : The record in this case fails to show that the motion for a new trial was filed within three days after the rendition of the judgment. The recital in the record is as follows : "Afterwards, to wit, on the — day of ———, 1890, said plaintiffs filed herein their motion for a new trial of this cause, which motion is in the words and figures following, to wit.'' We therefore are not at liberty to examine the record for the purpose of determining such question as could only be raised on a motion for a new trial. (*Deford v. Orvis,* 52 Kas. 432 ; *City of Eskridge v. Lewis,* 51 id. 376.)

Counsel for defendants in error contend that this ends the inquiry ; that every question that could be raised on the record, except whether the pleadings uphold the judgment, would properly arise only on a motion for a new trial, and has been waived by the plaintiffs' failure to file their motion in due time. The position of the learned counsel is not sound. Section 306 of the code of civil procedure defines a

new trial as follows: "A new trial is a re-examination in the same court of an issue of fact after a verdict by a jury, report of a referee, or a decision by the court." The section then prescribes the grounds on which a new trial may be granted. It requires only a careful reading of this section to show that it applies only to the trial of issues of fact. Section 265 of the code defines a "trial" as "a judicial examination of the issues, whether of law or fact, in an action." The succeeding section provides for the trial of issues of law by the court, unless referred, and of issues of fact by a jury, the court, or referee. In order to obtain a new trial of an issue of fact, a motion or petition must be filed in accordance with the provisions of §§ 308, 309 or 310 of the code. When an issue of law has been tried and determined by the court, a motion for a new trial is not required as a condition precedent to the right of the party to have the decision of the court reviewed on petition in error. This is conceded as to decisions of the issues of law arising on the pleadings by demurrer or otherwise. Nor is it contended that the rule would be different if all of the facts had been agreed to by the parties. It is contended, however, that, as the facts found by the trial court were excepted to by both parties, they cannot be regarded as the conceded facts of the case, and the decision of the court of the issues of law based on such findings can only be reviewed after a motion for a new trial has been duly filed and overruled.

Whether this court could proceed to direct judgment on findings which were excepted to by the successful party under § 559 of the code, we shall not now stop to consider. All it is necessary to determine in this

connection is whether the court may review the con-
clusions of law and judgment, based on the conclusions
of fact, found by the trial court.    The conclusions of
fact stand as the result and final determination of the
issues of fact in the case, and where no new trial is
asked by either party, where no motion is made to set
aside such findings of fact, or any of them, they stand
as the facts in the case. · They supersede the aver-
ments of the pleadings, at least so far as they are
consistent with the issues properly triable.    They
eliminate whatever false averments and claims have
been made by either party, and present to the trial
court the basis of fact on which arise the issues of
law.    They stand as a statement of facts similar, if
not in fact in all respects identical, with the state-
ments of a petition challenged by demurrer, or an
agreed statement of facts, or a special verdict of a
jury, as to the legal effects and consequences of which
issues of law arise, are argued and determined by the
court.    It may be contended that, on a trial before
court or jury, questions of law arise which must be
passed on by the court; that in the admission of evi-
dence, in instructing the jury and in various other
rulings as the trial progresses, the court decides is-
sues of law, and that the correctness of these rulings
can only be determined where a motion for a new trial
is duly presented.    One of the grounds for a new trial
is that the verdict is contrary to law.    This, it may
be said, presents the whole of the issues of law in the
case.    The answer to this contention, however, is that
it is only those rulings of the trial court which serve
as aids or directions to the jury, or which show the
process by which court or referee has reached its deter-
mination of the issues of fact, only those rulings which
are included in and summed up with the decision of

4—55 KAS.

issues of fact, which must be challenged by motion for a new trial. Where an action is tried by a jury and a general verdict only is rendered, all the rulings of the court and all the instructions are but aids to the jury in arriving at a general result, which sums up and covers all the facts and all the law applicable to the case. From the nature of such a trial, the questions of law and of fact are answered finally by the jury in one general verdict in favor of one party or the other. If an erroneous verdict has been reached it may be due either to a misdirection of the court as to the law or a failure to follow the testimony as to the facts. The legislature, therefore, has wisely provided that whenever a retrial of an issue of fact is sought, an application for that purpose must first be made to the trial court which has seen the witness, heard the testimony and is fully informed as to all that has occurred at the trial. When, however, all questions as to the facts have been eliminated, this court is in as good a position to determine issues of law upon a written statement of

2. Review— issue of law— facts as any trial court can be, and no ne-
new trial. cessity exists for the trial court to again pass on the identical questions of law arising in the case. This view of the law has been steadily adhered to by this court in very numerous decisions. (*Osborne v. Young*, 28 Kas. 769 ; *Horn v. Newton City Bank*, 32 id. 518 ; *Lender v. Caldwell*, 4 id. 339 ; *Coburn v. Weed*, 12 id. 182 ; *Holcomb v. Dowell*, 15 id. 379 ; *St. L. & S. F. Rly. Co. v. Shoemaker*, 38 id. 723 ; *Stettauer v. Carney*, 20 id. 474; *Stapleton v. Orr*, 43 id. 170 ; *Windmill Co. v. Buchanan*, 46 id. 314 ; *Comm'rs of Wyandotte Co. v. Arnold*, 49 id. 279.) This conclusion in no manner conflicts with the cases of *Nesbit v. Hines*, 17 Kas. 316 ; *City of Atchison v. Byrnes*, 22 id. 65, or *Lucas v. Sturr,*

21 id. 480.   We still adhere to the rule that, in order
to review any errors of law occurring at the trial of
an issue of fact, a motion for a new trial must be duly
filed and considered by the trial court.

The findings of the trial court show that the deed
from John Ritchie and wife to the Kansas, Nebraska
& Dakota Railway Company and the written con-
tract executed on behalf of the railway company to
Ritchie were executed at the same time, each as an
inducement and consideration for the other.   They
separately evidence a part of the agree-
ment, the whole of which can only be as-
certained from considering the two writings
together.   The land conveyed was valuable property,
located within a half mile from the state capitol, and
prior to the trial of this action became included within
the corporate limits of the city of Topeka.   The only
considerations for the conveyance were :  First, a nom-
inal money consideration of $1 ;  second, the construc-
tion and operation of the Kansas, Nebraska & Dakota
railroad over the land to Fort Scott ;  third, the erec-
tion, maintenance and use of a passenger-depot and a
freight-depot for the accommodation of the public.;
fourth, free transportation for the grantors during
their lives over the railroad to be constructed by the
grantee.

The tract of land conveyed included about 10 acres
in a quarter-section, most of which was owned by the
grantors.   The main object in making the grant was.
to enhance the value of the remaining property of the·
grantors by the construction of the railroad and depots..
Ritchie platted a portion of the remaining lands into
city lots, expecting that the sale thereof at good prices
would be stimulated by the construction of the new
railroad and the establishment and use of the depots

3. Two written
instruments,
treated as one.

on the land conveyed. The mere construction of a railroad across a piece of land is ordinarily regarded as a disadvantage to the remaining portions rather than an advantage ; but the erection and maintenance of depot buildings in or near a populous city, to which great numbers of people will find it necessary to resort for the transaction of business, and in traveling to and from the city, usually tends to materially enhance the value of neighboring property. The negotiations between the railway officials and Ritchie with reference to a right-of-way and ground for depots, switches and other purposes resulted in the execution of the deed and contract copied in the findings. The railway company procured the land without the expenditure of any but a nominal sum of money. It paid therefor by its written agreement which Ritchie accepted as an equivalent for the value of the land. The substantial requirements of that contract were that the railroad company should construct its line of railroad through the land ; that it should erect and forever maintain upon said land a passenger-depot and a freight-depot of a size and character suitable and sufficient for the transaction of its business and the accommodation of the public at said point, and should cause all passenger- and freight-trains to stop at such depots respectively so as to transact business and perform all business that might be offered. The contract further provides :

"And if said company shall fail to construct its line of railroad through said tract of land and erect thereon said passenger- and freight-depots within one year from this date, or shall fail to keep and maintain said depots and use the same as herein provided, then the conveyance of said real estate to said company shall be void, and said real estate shall revert to said John Ritchie and his heirs."

It appears from the evidence that the railroad company did construct its railroad across the lands, and did erect two buildings, one suitable for a passenger-depot and the other suitable for a freight-depot, in accordance with the requirements of the contract and within the time limited. It also appears that the freight-depot was used for the purpose for which it was designed from the time of its construction. The court further finds that—

"From the time of completion of said passenger-depot up to the commencement of this action it was not kept open for the accommodation of passengers, and although there was a stove in the middle or office-room, no fire was kept in it except occasionally, and during part of the time the stovepipe was down. Temporary plank seats were left in the waiting-room on completion of the building, but they were removed at some time which does not distinctly appear. Passengers awaiting trains stood or sat upon the depot platform, the projecting roof at the side or end affording some shelter from snow and rain, but sometimes they would go into the office-room of the freight-depot where a fire was kept when the weather required it, and the freight-depot room was always unlocked, except when employees were absent at meals or temporarily on business, and no passengers were excluded from said room, although there was no sign or notice posted to show that it was intended for the accommodation of passengers, and the only seating arrangements were two or three chairs. No passenger- or freight-traffic was ever refused at South Topeka."

No tickets were kept on sale at the passenger-depot until about 10 days before the commencement of the trial in the district court, which appears from the record to have been on the 25th day of November, 1889. No baggage was checked, and, in fact, none of the ordinary facilities afforded by a passenger-depot were provided by the railway company. The build-

ing designed for a passenger-depot might, so far as the accommodation of the public was concerned, have been called anything else as well as a passenger-depot. A barn from which the public were excluded, if surrounded by a platform and wide eaves, would have answered the same purpose.

The findings further show that the building at the corner of Adams and Fifth streets was the only one, in fact, used for a passenger-depot prior to the commencement of this action. Can this be held to be a substantial compliance on the part of the railroad company with its contract? Clearly it cannot. The substantial advantage which would have accrued to Ritchie and his heirs from a passenger-depot, at which tickets were sold, baggage checked, information given, passengers sheltered and accommodated while waiting for trains, with all the other usual and ordinary conveniences for the public, were denied and withheld from them. Can the railroad company say because it built and maintained a freight-depot, and had a building, which it did not use, for a passenger-depot, that it has fulfilled its contract? The contract says it shall do both. It has then as much right to withhold both as one. The fact that the company has constructed side-tracks, roundhouse, stock-yards, water-tank, and various other buildings for its own convenience and accommodation, found in detail by the trial court, have no tendency whatever to show a compliance with the contract, whatever equitable considerations may arise from them. The contract of the railroad company converts the estate passed by the deed into one on conditions subsequent. The continuance of the railroad company's estate depends on its performance of the conditions, and it is not necessary for the

4. Deed—breach of conditions subsequent—title.

court to inquire as to the damage resulting to the plaintiffs from the non-performance of the conditions, for, the parties having stipulated that the estate shall revert in case of a breach of the conditions, the plaintiffs cannot be driven to an action for damages for each recurring breach of the covenant. The question is, Have the conditions been substantially complied with? The court finds facts showing that that requiring the maintenance of a passenger-depot has not been so fulfilled. May the plaintiffs, then, maintain ejectment to recover the land? By the common-law advantage of a breach of a condition subsequent working a forefeiture of an estate could only be taken by formal entry, on the principle that it required as solemn an act to defeat as to create an estate. (2 Washb. Real Prop. 14.) But in this state there is no such thing as livery of seizin in the common-law sense. Estates are created by written instruments. Delivery of possession of land is, of course, a circumstance of some weight in determining questions of title. Under our statute, a party having either a legal or an equitable title may maintain an action for the recovery of real property. (*Simpson v. Boring*, 16 Kas. 248.) No formal entry is necessary here as a condition precedent to the bringing of an action of ejectment. Recent authorities are

5. Ejectment on breach— formal entry.

to the effect that an ordinary action of ejectment answers all purposes of a common-law entry. (Tied. Real Prop., § 277.) The condition on which the grant was made being lawful, and one which the parties had a right to agree upon, must be enforced on the demand of the plaintiffs. (*Clarke v. Brookfield*, 81 Mo. 503 ; *Jeffery v. Graham*, 61 Tex. 481 ; *Richter v. Richter*, 111 Ind. 456 ; *Heywood v. Land and Town Improvement Association*, 11

Pac. Rep. 246; *Railway v. Hood*, 66 Ind. 580; *Pepin Co. v. Prindle*, 61 Wis. 301; *Railroad Co. v. Covington*, 2 Bush, 526; *Railway Co. v. Griffeth*, 17 S. W. Rep 277; *Horner v. Railway Co.*, 38 Wis. 165; *Wilson v. Wilson*, 86 Ind. 472; *Railway Co. v. Coburn*, 91 Ind. 507; *O'Brien v. Wetherell*, 14 Kas. 616.)

It is strenuously insisted that the plats filed by the Ritchies operated as a dedication of the lands for railroad purposes. To this, however, we cannot assent, for several reasons: (1) A dedication of land can only be made by the person who is the owner of the land at the time the dedication is made. (*Boerner v. McKillip*, 52 Kas. 508.) The legal title to this land was in the railroad company at the time these plats were filed. The land having been conveyed on conditions subsequent, the title of the company was not divested until the grantor or his heirs claimed a forfeiture. The railroad company had nothing to do with the execution of the plat; hence, no statutory dedication was made. (2) While the location of the tracks and depot buildings of the defendant are shown on the map, and in a space not platted into lots where the depots are shown to be located, the words "K. N. & D. depot grounds" appear, only the boundaries of the tract on the side next the city of Topeka are shown on the map. No eastern boundary whatever is indicated, nor are streets indicated through the lands covered by the deed to the railroad company, except by dotted lines. No distances on any boundary of the tract are given. (3) While the streets and alleys are expressly dedicated to public uses, there is nothing written on the plats indicating a purpose to dedicate any lands to railroad uses. All that can be said in any way to indicate such a purpose, is the fact that the locations of the

6. Dedication— none to railroad uses— no estoppel.

tracks and buildings are marked on the plat.    We
think this could be done with perfect safety and pro-
priety, because the tracks and buildings were already
there, and the plats merely show what was visible to
the eye on the ground and their locations with refer-
ence to the balance of the property.

The lands in controversy having been conveyed on
valid conditions subsequent, and there having been
a substantial breach of those conditions, the plaintiffs
may maintain ejectment for the recovery of the lands.
It only remains to consider what order this court
should make on the facts presented by the record.
The petition alleges that the plaintiffs are the owners,
both in law and equity, of the lands in controversy,
and that they are entitled to the possession thereof,
and asks judgment for their recovery.    The answer
is a general denial.    The facts developed at the trial
and stated in the findings of the court show that the
plaintiffs seek to enforce the forfeiture of the estate
granted by John Ritchie, deceased, and wife to the
Kansas, Nebraska & Dakota Railway Company.    ·The
findings also show that the railway company took·
possession under the deed, and thereafter constructed
many valuable improvements, which are still on the
land.    Are the plaintiffs also entitled to recover these
improvements as a part of the realty?    While the
law enforces the lawful contracts of parties, and even
gives effect to forfeitures, equity gives relief against
the hardships incident to such forfeitures in very
many cases.    It is a universal rule that
the instrument creating the forfeiture will
be strictly construed, and that its terms
will never be extended by construction.    (*Wier v. Rail-
road Company*, 40 Kas. 130.)    The general doctrine

7. Conditions
subsequent,
strictly
construed.

of equity on this subject is thus stated in Pomeroy on Equity Jurisprudence (§ 381) :

"The general doctrine was finally settled that wherever a penalty or forfeiture is inserted merely to secure the payment of money or the performance of some act or the enjoyment of some right or benefit, equity regards such payment, performance or enjoyment as the real and principal intent of the instrument, and the penalty or forfeiture as merely an accessory and will therefore relieve the debtor party from such penalty or forfeiture whenever the actual damages sustained by the creditor party can be adequately compensated."

In this case, the damages resulting to the grantors from a failure of the grantee to comply with the conditions of its contract for a given period of time are not susceptible of accurate measurement. How much the plaintiffs might have been benefited by the maintenance and use of a passenger-depot prior to the commencement of this suit is, of necessity, a matter of opinion and speculation rather than accurate computation. The parties by their contract have said that the estate granted shall revert to the grantor in case of a failure to perform the conditions. The estate granted was the bare land, and that estate, we think, reverts to the heirs of the grantor. The railroad-tracks, roundhouse, depot buildings, etc., were not granted by the deed, but have been constructed by the grantee. The values of the various improvements made by the railroad company are not stated in the findings. The defendant, being a railway corporation, has a right to condemn these lands, or so much thereof as is necessary for its use, but in case of such condemnation would be required to make full payment therefor. In this case, the defendants have not

filed any pleading praying relief from the effects of
the forfeiture, but as the plaintiffs allege an equitable
estate, and as the rules of pleading in actions of this
kind under the code are extremely liberal, we do not
feel at liberty to direct a judgment to be entered on
the special findings which would be inequitable.
The filing of the plat by Ritchie, and of the subse-
quent one by his heirs, are some evidence that up
to that time the plaintiffs had not insisted on a for-
feiture ; but the findings of fact show that the non-
user of the depot building continued after the filing
of the plats up to and after the time of the com-
mencement of this action. A waiver on the part of
the plaintiffs of past breaches of the condition cannot
be construed into a waiver of all right to future observ-
ance and performance of it. The right to a forfeiture
was first insisted on and brought to the knowledge of
the defendants by the commencement of this action.
We think the rights of the parties should be deter-
mined as of that date ; that under the facts as dis-
closed by the record and the findings of the court the
plaintiffs were entitled to recover the specific property,
or its value measured as of that date ; but if the de-
fendants desire to maintain a railroad across the
lands and to continue the use thereof for railroad pur-
poses, they should be permitted to retain
the land and also the improvements they
have constructed thereon on payment of
the value of the land computed as of the
date of the commencement of this action, with interest
since that time, without any charge on account of
improvements made by the defendant thereon. (*Cohen
v. Railroad Co.*, 34 Kas. 158.) There are no findings
in the record showing what this value was, nor has
the defendant indicated its desire to retain and pay for

8. Rights of
   railroad
   company—
   measure of
   recovery.

9. New trial.    the land.    The incompleteness of the find-
ings renders it necessary to direct a new
trial of the action.    The judgment is therefore re-
versed for further proceedings in accordance with the
views above expressed.

All the Justices concurring.